# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

DESIREE SPARROW,
    Plaintiff,

vs.

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant.

Case No. 1:18-cv-745
Dlott, J.
Litkovitz, M.J.

**REPORT AND
RECOMMENDATION**

Plaintiff Desiree Sparrow brings this action pursuant to 42 U.S.C. §§ 405(g) and

1383(c)(3) for judicial review of the final decision of the Commissioner of Social Security

(Commissioner) denying her application for children's Supplemental Security Income (SSI)

benefits. This matter is before the Court on plaintiff's statement of errors (Doc. 8) and the

Commissioner's response in opposition (Doc. 15).

## I. Procedural Background

An application for child's SSI benefits was filed on plaintiff's behalf in September 2015,

when she was considered a school-age child.[1] Plaintiff alleges disability since October 1, 2011

due to bi-polar disorder with a history of psychosis, attention deficit hyperactivity disorder

(ADHD), post-traumatic stress disorder (PTSD), and blindness in her left eye. Plaintiff's

application was denied initially and upon reconsideration. Plaintiff requested and was granted a

*de novo* hearing before administrative law judge (ALJ) Robert Flynn on January 10, 2018.

On March 30, 2018, ALJ Flynn issued a decision denying plaintiff's SSI application. Plaintiff's

request for review by the Appeals Council was denied, making the decision of ALJ Flynn the

final administrative decision of the Commissioner.

---

[1] Plaintiff turned eighteen years old prior to the filing of this federal court action.

## II. Analysis

### A. Legal Framework for Disability Determinations

To qualify for SSI as a child under the age of 18, plaintiff must file an application and be an "eligible individual" as defined in the Act. 42 U.S.C. § 1382(a); 20 C.F.R. § 416.202. Eligibility is dependent upon disability, income, and other financial resources. *Id.* An individual under the age of 18 is considered disabled for purposes of SSI "if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i).

The Social Security regulations set forth a three-step sequential analysis for determining whether a child is disabled for purposes of children's SSI benefits:

1. Is the child is engaged in any substantial gainful activity? If so, benefits are denied.

2. Does the child have a medically severe impairment or combination of impairments? If not, benefits are denied.

3. Does the child's impairment meet, medically equal, or functionally equal any in the Listing of Impairments, Appendix I of 20 C.F.R. pt. 404, subpt. P. 20 C.F.R. § 416.924(a)? If so, benefits are granted.

20 C.F.R. § 416.924(a)-(d).

If an impairment does not meet a listed impairment, disability may nonetheless be established if the child's impairment is medically or functionally equivalent to a listed impairment. A child's impairment is "medically equivalent" to a listed impairment if it is "at least equal in severity and duration to the criteria" of a listed impairment. 20 C.F.R. § 416.926.

2

In determining whether a child's impairment(s) functionally equals the listings, the adjudicator must assess the child's functioning in six domains:

1. Acquiring and using information;

2. Attending and completing tasks;

3. Interacting and relating with others;

4. Moving about and manipulating objects;

5. Caring for yourself; and

6. Health and physical well-being.

20 C.F.R. § 416.926a(b)(1)(i)-(vi). To functionally equal an impairment in the listings, an impairment must result in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(d). The relevant factors that will be considered in making this evaluation are (1) how well the child initiates and sustains activities, how much extra help he or she needs, and the effects of structured or supportive settings; (2) how the child functions in school; and (3) the effects of the child's medications or other treatment. 20 C.F.R. § 416.926a(a)(1)-(3).

An individual has a "marked" limitation when the impairment "interferes seriously with [the] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i). A "marked" limitation is one that is "more than moderate" but "less than extreme." *Id.* An "extreme" limitation exists when the impairment "interferes very seriously with [the] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i). Day-to-day functioning may be "very seriously limited" when only one activity is limited by the impairment or when several activities are limited by the impairment's cumulative effects. *Id.*

3

If the child's impairment meets, medically equals, or functionally equals an impairment in the listings, and if the impairment satisfies the Act's duration requirement, then the child is considered disabled. 20 C.F.R. § 416.924(d)(1). If both of these requirements are not satisfied, then the child is not considered disabled. 20 C.F.R. § 416.924(d)(2).

## B. The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of fact and conclusions of law:

1. The [plaintiff] was born [in] . . . 2000. Therefore, she was an adolescent on August 31, 2015, the date application was filed, and is currently an adolescent (20 CFR 416.926a(g)(2)).

2. The [plaintiff] has not engaged in substantial gainful activity since August 31, 2015, the application date (20 CFR 416.924(b) and 416.971 et seq.).

3. The [plaintiff] has the following severe impairments: idiopathic scoliosis with remote fusion at T3-L2 and castoplasty; right knee sprain with possible MCL tear and bursitis; major depressive disorder; hypomania; bipolar disorder; anxiety disorder; post-traumatic stress disorder (PTSD); a conduct disorder; attention deficit hyperactivity disorder (ADHD); a psychotic disorder; and schizophreniform disorder (20 CFR 416.924(c)).

4. The [plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.924, 416.925 and 416.926).

5. The [plaintiff] does not have an impairment or combination of impairments that functionally equals the severity of the listings (20 CFR 416.924(d) and 416.926a).

6. The [plaintiff] has not been under disabled, as defined in the Social Security Act, since August 31, 2015, the date the application was filed (20 CFR 416.924(a)).

(Tr. 15-34).

In determining that plaintiff's impairments were not functionally equivalent to a listed

impairment, the ALJ found:

1. [Plaintiff] has less than marked limitation in acquiring and using information. (Tr. 29-30).

2. [Plaintiff] has less than marked limitation in attending and completing tasks. (Tr. 30-31).

3. [Plaintiff] has less than marked limitation in interacting and relating to others. (Tr. 31-32).

4. [Plaintiff] has less than marked limitation in moving about and manipulating objects as a result of her impairments. (Tr. 32).

5. [Plaintiff] has less than marked limitation in the ability to care for herself as a result of her impairments. (Tr. 33).

6. [Plaintiff] has less than marked limitation in health and physical well-being. (Tr. 33-34).

## C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers*, 582 F.3d at 651 (quoting *Bowen*, 478 F.3d at 746). *See also Wilson*, 378 F.3d at 545–46 (reversal required even though ALJ's decision was otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

**D. Relevant Medical Evidence**

### 1. Cincinnati Children's Hospital Records

In March 2013, when she was 12 years old and in seventh grade, plaintiff was seen by a therapist, Alicia Vonville, LPCC, for a trauma evaluation. Plaintiff alleged she was sexually assaulted by a school janitor about three weeks prior. Plaintiff's family reported significant concerns with her depression and anxiety. These problems were first noted about two months prior and were present both at home and in school. With regard to anxiety, plaintiff and her family noted concerns of frequent fearfulness or worrying, fear of making mistakes or trying new things, fear of social situations, feeling keyed-up or on-edge, insomnia, heart palpitations, and sweating. With regard to depression, plaintiff reported feelings of sadness/hopelessness, overeating, insomnia, increased sleepiness, difficulty concentrating/making decisions, and increased thoughts of death. (Tr. 1238). At the time of the evaluation, plaintiff was in a regular classroom, not receiving any special services, and had not been having difficulties with academic performance. Plaintiff's grades were generally A's and B's, and she had consistent performance in most subjects. Plaintiff did not repeat or skip any grades. Socially, plaintiff was outgoing and

involved in extracurricular activities, including basketball and track. (Tr. 1239). During the mental status examination, plaintiff reported auditory and visual hallucinations of seeing and hearing a man's voice. Her judgment and insight were appropriate for age, and she was oriented, had fair attention and concentration, an anxious mood, and an appropriate affect. Ms. Vonville assessed PTSD, psychosis NOS. Plaintiff was to begin individual therapy sessions and was referred to psychiatry for medical somatic services. (Tr. 1240).

The following month, plaintiff was evaluated by psychiatrist, Dr. Drew Barzman, M.D., for pharmacological management and to monitor her psychotic disorder. Plaintiff's mother reported that plaintiff experienced significant social withdrawal, verbal incidents at school, and aggression towards her brother. It was noted plaintiff was socially outgoing and was involved in the track and basketball teams at school. Plaintiff alleged that a school janitor inappropriately touched her on the thigh. (Tr. 1283). Dr. Barzman noted plaintiff had a history of psychotic disorder. Dr. Barzman described her presentation as "atypical. However, CCHMC medically cleared her and ruled out a medical etiology." (Tr. 1284). He noted that although she had psychotic symptoms, she was functioning well in sports and academics. He believed that plaintiff's psychotic symptoms may be related to trauma. Dr. Barzman also noted a history of auditory hallucinations, visual hallucinations, and delusions, but plaintiff denied any auditory hallucinations within the past eight days. Plaintiff exhibited some PTSD symptoms. Dr. Barzman started plaintiff on Risperdal to address her psychotic and PTSD symptoms. (*Id.*).

In August 2013, plaintiff and her mother reported to Dr. Barzman that her psychosis had improved significantly. She had no recent outbursts and no recent aggression to herself or others. Plaintiff denied hallucinations and delusions. Dr. Barzman noted that plaintiff's symptoms had been mild and improving since her last visit. Dr. Barzman noted that plaintiff's

7

social functioning declined, but she was still able to participate in basketball and track. (Tr. 1444). On mental status examination, plaintiff's attention and concentration were good, appropriate and fair for her age. (Tr. 1445). There was no evidence of hallucinations or delusions, and plaintiff exhibited a euthymic mood and restricted affect. Plaintiff was neither depressed nor anxious, and there were no psychotic symptoms or thoughts. Dr. Barzman diagnosed plaintiff with psychotic disorder NOS and ruled out schizophreniform. (*Id.*).

When seen the following month, plaintiff's mother reported to Dr. Barzman that plaintiff's mood had been good overall, but there were some transient episodes of being quiet/withdrawn. (Tr. 1487). In October 2013, plaintiff had been doing well overall. Plaintiff's mother indicated the principal of the school called her recently to praise plaintiff for protecting another student who was being bullied. Plaintiff's mother indicated plaintiff becomes mildly irritable about three to four times a week at home. (Tr. 1516). Dr. Barzman noted that plaintiff had been functioning well at school both academically and socially and was earning A's, B's, and C's. (*Id.*).

In December 2013, plaintiff saw her therapist, Ms. Vonville, and presented with a dysphoric mood and irritable affect. Her mother requested the counseling session due to increased anger, lying, behavioral outbursts, aggressive impulses, and oppositional behavior. Plaintiff would not engage in processing anger and responded to questions with "I don't know" responses. (Tr. 1544-45). During a visit with Dr. Barzman in December 2013, plaintiff's mother reported that plaintiff had exhibited angry, irritable, manipulative, lying, and withdrawn behaviors. (Tr. 1557). On mental status examination, plaintiff's mood was euthymic; her affect was appropriate; she was pleasant and bright; and she smiled appropriately. Plaintiff denied having any suicidal ideation/self-harm thoughts, and there were no psychotic symptoms. Dr.

Barzman found no evidence for psychosis. (Tr. 1558). Plaintiff's dose of Risperdal was increased to target her mood symptoms and increased anger. (Tr. 1559).

In January 2014, plaintiff reported mild anger and less irritability to Dr. Barzman. (Tr. 1589). Dr. Barzman noted that plaintiff "seemed more open and less guarded today." (*Id.*). Plaintiff exhibited logical, coherent, and appropriate thought processes. There was no evidence of hallucinations or delusions. (Tr. 1590). Dr. Barzman noted that plaintiff's status was improving overall. (*Id.*). Dr. Barzman assessed plaintiff with Bipolar Disorder, Type II, much improved and a history of PTSD with much-improved symptoms. Plaintiff was instructed to continue taking Risperdal and attend therapy. (Tr. 1591).

In February 2014, plaintiff's mother reported that plaintiff's moods fluctuated between being irritable and elevated and euthymic within 24 hours. Plaintiff's mother noted that plaintiff could be giddy and then become very irritable. However, there were no recent hypomanic or depressive episodes. (Tr. 1624). Plaintiff denied recent auditory or visual hallucinations or aggression to herself or others. There was no evidence for psychosis, and plaintiff's cognition was intact and her impulsivity was low. (Tr. 1625). Dr. Barzman increased plaintiff's Risperdal dosage. (Tr. 1626).

In May 2014, plaintiff reported to Dr. Barzman that she was doing well in basketball and getting good grades. Plaintiff reported occasional moodiness for 60 to 90 minutes but no aggression toward herself or others. (Tr. 1672). In July 2014, plaintiff's mother reported increased moodiness, persistent irritability, anti-social attitude, and lack of empathy. (Tr. 1690). Plaintiff denied hallucinations and aggression towards herself or others. On mental status examination, plaintiff's mood was euthymic, and her affect was mildly irritable, appropriate, and

restricted. (Tr. 1691). Dr. Barzman increased plaintiff's Risperdal to target her mood symptoms given that plaintiff was not taking the fully prescribed dosage. (Tr. 1692).

Plaintiff was seen by Mary Meyer, RN, CNS, in October 2014. Plaintiff was guarded and reluctant to engage. She stated that she did not like her medication and did not want to take it. Ms. Meyer continued to discuss the appropriateness of Risperdal for both psychosis and mood issues. Plaintiff and her mother agreed that symptoms had decreased since the start of the medication. They agreed that there were no longer hallucinations and the level of suspiciousness and mood instability lessened. Plaintiff's mother reported that was doing well in school with no behavioral problems. (Tr. 1747-48).

On July 24, 2015, plaintiff went to the emergency department for a psychological evaluation. It was reported that plaintiff was not doing well since her cousin died from an asthma attack two weeks prior. Plaintiff was suspected of stealing a gun and ammunition from a friend's home, and an evaluation was recommended after plaintiff's mom called psychiatry. (Tr. 677). During a psychiatric intake assessment, plaintiff noted "I don't really know why I'm here." Plaintiff's mother noted that plaintiff had an increase in depressed mood and a decrease in sleep and appetite since her cousin's death. Plaintiff also ran away from home. Plaintiff's mother reported that plaintiff has an infatuation with guns, but plaintiff denied seeing or taking the gun from her friend's home. Plaintiff was initially quiet and passive during the assessment. She denied suicidal or homicidal ideation and recent auditory hallucinations. On mental status examination, plaintiff was passive, guarded, and minimally responsive. Plaintiff exhibited a depressed and anxious mood with a flat affect. Her attention and concentration, judgment, insight, and impulse control were all noted to be fair. (Tr. 684).

Plaintiff saw Ms. Meyer again on July 30, 2015. Plaintiff's mother described paranoid thinking and reported that plaintiff had no friends, frequent irritability, and stole from family members. However, plaintiff was not taking her medication as prescribed. They discussed how plaintiff needed to take her medication consistently. (Tr. 1794-95).

### 2. St. Aloysius Orphanage Counseling Records

Plaintiff was assessed in outpatient therapy on August 26, 2015. Plaintiff reported to be there because of "my mood swings, I'll be jumpy one minute and then real calm. I get really angry out of nowhere. Also depression; nothing will be wrong with me and I will be sad. I start thinking about my cousin who died and my grandfather who is in jail, I'll get sad." (Tr. 716). Plaintiff's mother reported that plaintiff suffered from hallucinations and paranoia. (*Id.*). Plaintiff's mother reported that traumatic events seemed to trigger more symptoms of paranoia, depression, change in identity, and withdrawal. (*Id.*). Plaintiff was assessed with PTSD and recommendations were made for therapy and a psychopharmacological evaluation. (Tr. 733, 735).

Dr. Kim Rosenzweig, Psy.D., met with plaintiff on September 8, 2015, to review her treatment plan. (Tr. 854-59). Plaintiff reported traumatic events including witnessing someone take a gunshot to the head and being assaulted by a janitor at her school who she still sees in the community. She reported intrusive memories, hearing voices, and hallucinations. Plaintiff also reported avoidance behaviors, and showed symptoms of detachment, estrangement, and withdrawal. Both plaintiff and her mother reported that she had mood swings, irritability, anger outbursts, and anger/sadness for no reason. She experienced hypervigilance, including closing blinds, being easily startled, demanding privacy, and checking on things often. (Tr. 854). At that time, plaintiff was referred for trauma therapy and medical somatic services. (Tr. 854-59).

On September 14, 2015, plaintiff underwent an initial psychiatric evaluation with Dr. Kim Roebuck, M.D. (Tr. 736-44). On mental status examination, plaintiff's appearance was unkempt, her demeanor was noted to be withdrawn and severe, and she exhibited avoidant eye contact. She exhibited guarded thought content, blocked thought process, irritable mood, constricted affect, and withdrawn behavior. No delusions or hallucinations were reported. (Tr. 739-41). Dr. Roebuck reported: "[Plaintiff] is slow to warm up, avoids eye contact, but is passively cooperative. No smiles whatsoever. Mood is irritable and withdrawn. Doesn't initiate conversation or ask questions. Doesn't relate or make eye contact with her mother." (Tr. 741). Plaintiff was diagnosed with Major Depressive Disorder, single episode, severe without psychotic features; Posttraumatic Stress Disorder; and Conduct Disorder, adolescent-onset type. (*Id.*).

In October 2015, plaintiff reported to Dr. Roebuck that she had no hallucinations in a year and a half and no paranoia except for closing the blinds as soon as she comes home from school. (Tr. 784). Plaintiff was currently on probation for stealing a gun from her cousin. (*Id.*). School was going better, and her grades improved. Dr. Roebuck noted that plaintiff's mood was less withdrawn, her affect was less constricted, and she smiled. Dr. Roebuck discontinued Risperdal and increased Paxil to target plaintiff's depressed mood. In November 2015, plaintiff's mother reported to Dr. Roebuck that plaintiff was doing well off the Risperdal and was happy and busy with basketball. Plaintiff's anger was controlled. (Tr. 787). During a November 2015 session with Dr. Kim Rosenzweig, Psy.D., plaintiff was avoidant of eye contact and reported not taking her medicine. (Tr. 779-80). In December 2015, plaintiff reported being angry and hearing voices again. Plaintiff noted that she never stopped hearing voices in 18 months but was "unable to identify the reasons for not telling others that she still heard the

voices." (Tr. 782). Dr. Rosenzweig gave psychoeducation about the properties of marijuana and its possible connection to an increase in hallucinations given that plaintiff admitted to using marijuana when feeling upset. (Tr. 783). Plaintiff became very emotional while discussing her grief and anger. (*Id.*).

In March 2016, plaintiff reported a reduction in some symptoms but some periods of difficulty managing anger that sometimes were problematic at school. (Tr. 844). By September 2016, Dr. Rosenzweig reported that plaintiff had stopped all medications and had increased difficulty with managing anger. (Tr. 837). In March 2017, Dr. Rosenzweig reported that plaintiff has struggled to maintain her placement at Hamilton High School and had been suspended on more than one occasion. She continued to report difficulty managing her anger but made significant progress on her trauma therapy. (Tr. 830).

### 3. Medical Opinions

State agency reviewing psychologists, Joseph Edwards, Ph.D., Melanie Bergsten, Ph.D., and state agency reviewing pediatricians, Elizabeth Roseberry, M.D. and Frank Stroebel, M.D., reviewed the record in November 2015 and March 2016, respectively. Drs. Edwards and Roseberry opined that plaintiff had less than marked limitations in the domains of acquiring and using information, attending and completing tasks, caring for herself and health and physical well-being; marked limitations in interacting and relating with others; and no limitation in moving about and manipulating objects. (Tr. 106-07). Drs. Edwards and Roseberry indicated that plaintiff's impairments did not medically or functionally equal Listings 112.06 (Anxiety Disorders), 112.04 (Mood Disorders), 112.11 (ADHD), or 102.04 (Loss of Visual Efficiency, or Visual Impairment). (Tr. 107, 119). On reconsideration, Drs. Bergsten and Stroebel largely affirmed the opinions of Drs. Edwards and Roseberry. (Tr. 117-19).

## E. Relevant Educational Records

In January 2014, an initial meeting was held with the Hamilton City School District to discuss a 504 Plan for high school. Plaintiff's mother reported that plaintiff's grades had dropped since her initial hallucination. (Tr. 805). It was noted that plaintiff wrote a letter stating that she was going to kill her mom and brother. (*Id.*). Plaintiff's 504 Plan showed that plaintiff has been diagnosed with Bipolar disorder with a history of severe depressive symptoms, hypomania, and psychosis. The report indicated that during plaintiff's "depressive cycle," she puts her head down in class, zones out, does not complete work, decreases communication with teachers, has a defensive attitude when confronted about her behaviors, and participates less in class. The Plan explained that these behaviors affected plaintiff's learning, concentration, and communication. (Tr. 807). As part of the 504 Plan's accommodations, plaintiff received extra time to complete classwork (up to double) and extended time (up to double) for exams/tests. (Tr. 808).

In the fall of 2015, when plaintiff was in tenth grade, plaintiff's 504 Plan allowed for extended time to complete classwork and tests/quizzes and a "cooling down" period when needed, where plaintiff could request to see the guidance counselor, school nurse, or assistant principal. (Tr. 268-70). Teacher questionnaires completed in October 2015 noted that plaintiff consistently needed teacher or peer help, did not finish tasks in class, and had difficulty staying focused. (Tr. 237). She frequently asked to leave the room. (Tr. 238). Her physical education teacher reported that plaintiff was not motivated to complete tasks and refused to perform tasks at times. (Tr. 246). Her English teacher noted that plaintiff "works better alone because she is easily influenced by outside factors. She doesn't require much support, but generally asks if she

14

can work alone in my office." (Tr. 249). She found that plaintiff only had a slight impairment in attending and completing tasks. (Tr. 250).

Mrs. Blevins-Belew, an English teacher, completed a Teacher questionnaire in October 2016. Mrs. Blevins-Belew noted, in contrast to the prior year, plaintiff was much more focused and positive about school. She had a lower grade than others, but her behavior was excellent. Mrs. Blevins-Belew stated that plaintiff never distracted others, had good and bad days with respect to her effort and focus, and was always kind and respectful. Mrs. Blevins-Belew noted that plaintiff made use of extra assistance, extended time, and fill-in-the-blank tests. (Tr. 938-39).

An Individualized Education Plan (IEP) from October 2017, when plaintiff was a senior in high school, showed that plaintiff wanted to graduate on time and get a job after high school. (Tr. 866). Her learning style was described as "tactile." Plaintiff learned best through hands on activities, writing things down to learn and study information, and visual diagrams, graphs, and other visual representations. (*Id.*). Plaintiff preferred to work independently. (*Id.*). The IEP noted that plaintiff needed to improve coping skills related to anger and fluctuating moods; therefore, supports needed to be put in place to help her cope and develop additional strategies for interactions. (Tr. 868). Plaintiff's intervention specialist observed that plaintiff had three negative interactions with adults during the first quarter of the 2017-18 school year, but no negative interactions with her peers. (Tr. 872). In her senior year Behavioral Intervention Plan (BIP), it was noted that plaintiff was repeatedly absent or tardy from class, and she frequently left the school building without permission the previous school year. (Tr. 886).

### F. Specific Errors

On appeal, plaintiff alleges that the ALJ erred in (1) his findings of her ability to interact and relate with others and (2) failing to find that she has marked limitations in her ability to attend and complete tasks. (Doc. 8).

### 1. Whether the ALJ erred in his findings of plaintiff's ability to interact and relate with others.

Plaintiff argues that the ALJ erred in finding that plaintiff had a "marked" limitation in interacting with others when evaluating whether she met the severity of a listed impairment and later finding that plaintiff has a "less than marked" limitation in interacting and relating with others when addressing the domains of functioning under the whole child approach. (Doc. 8 at 2). Plaintiff argues that these findings are internally inconsistent. (*Id.* at 3). Plaintiff argues that the record supports an extreme, or at least marked, limitation finding in her ability to interact and relate with others. (*Id.*).

Plaintiff cites to treatment records that she contends are consistent with an extreme limitation in her ability to interact and relate to others. (Doc. 8 at 3) (citing Tr. 1918-1933 (records showing her aggression toward her family and cutting herself after being teased); Tr. 1281-1285 (records showing significant social withdrawal, verbal incidents at school, and aggression towards her brother); Tr. 1444-46 (records showing noticeable decline in social functioning and not getting along well with cousins); Tr. 1487-89 (records showing transient episodes of being withdrawn/quiet); Tr. 1516-18 (records showing episodic irritability); Tr. 1544-45 (records showing irritable affect, increased anger, lying, behavior outbursts, aggressive impulses, and oppositional behavior); Tr. 1557-59 (records showing worsening anger, irritability, dislike for rules, manipulative, lying, and withdrawal); Tr. 1589-92 (records showing episodic hypomania with irritability and mild anger); Tr. 805-814 (school records showing decreased

communication with teachers, defensive attitude, anger, ignoring others, and a letter stating her plan to kill her mother and brother); Tr. 1624-26 (records showing fluctuating irritability); Tr. 1690-92 (records showing increased moodiness, persistent irritability, anti-social attitude, and lack of empathy); Tr. 1747-49 (records showing irritability, suspiciousness, aggression, paranoid thoughts, guarded demeanor, and reluctance to engage); Tr. 1996-2007 (records showing she ran away from home for a week); Tr. 1794-97 (records documenting paranoid thinking, frequent irritability, stealing from family members, and that she had no friends); Tr. 716-35 (records showing anger out of nowhere, paranoia, running away repeatedly, increasing withdrawal, and struggling to keep friends); Tr. 736-44 (psychiatric evaluation showing plaintiff had variable moods, left and did not come home, stole money, had unstable relationships, changed friends often, had a severely withdrawn demeanor, and irritable mood); Tr. 779-80 (plaintiff ran away for a week and stopped extracurricular activities); Tr. 782-83 (plaintiff angry most of the time and hearing voices); Tr. 830-31 (records showing plaintiff had multiple school suspensions, difficulty managing anger, irritability, and ran away from home).

In response, the Commissioner argues that substantial evidence supports the ALJ's finding that plaintiff's impairments did not functionally equal a listing because she did not have a marked limitation in two domains of functioning or an extreme limitation in one domain. (Doc. 15 at 3). The Commissioner argues that this finding is consistent with the treatment records, non-medical evidence, the opinions of the state agency reviewing physicians, the school psychologist, and the treating psychiatrist. (*Id.* at 3-4). The Commissioner acknowledges that the ALJ's finding that plaintiff had marked limitations in interacting and relating to others was inconsistent with his finding that plaintiff had less than marked limitations when assessing the domains of functioning. (*Id.* at 4). However, the Commissioner argues that this error "was

harmless because there is no evidence that Plaintiff had extreme limitations and a rating of marked limitations in one domain would not be sufficient to show that she functionally equaled the listing." (*Id.*).

In assessing whether plaintiff's mental impairments met or medically equaled a listed impairment, the ALJ determined that plaintiff's mental impairments "do not produce 'marked' or 'extreme' limitations in the areas of understanding, remembering, or applying information, interacting with others, concentrating, persisting, or maintain pace, or adapting or managing herself, which are needed to meet the criteria of Listings 112.02, 112.03, 112.04. 112.06, 112.08, 112.11, and 112.15. (Tr. 16). The ALJ concluded that plaintiff had "marked" but not "extreme" limitations in interacting with others. (Tr. 16). In support, the ALJ explained:

> As is shown below, there are references to the [plaintiff] playing basketball, including on the school team, and participating in track. She ran away in mid-2015, and stayed at a friend's home. (Tr. 2007-13). She stated in October 2015 that she hung out with male friends, whom she characterized or considered her brothers, but that she did not have any female friends. (Tr. 784). She denied significant conflicts with teachers or peers in November 2015 (Tr. 787). She stated in October 2017 that, although she had no driver's license, she could get to work by having a friend or family member drive her (Tr. 871). The record, however, also showed she was troubled by traumatic events, had avoidant behaviors, mood swings and irritability, among other things.

(Tr. 16-17). In assessing whether plaintiff's mental impairments functionally equaled a listed impairment, the ALJ cited the same evidence as above and concluded that "[t]here is no evidence supporting limitations greater than 'less than marked' in the domain of interacting and relating to others." (Tr. 26, 31-32).

The domain of interacting and relating to others considers how well a child initiates and sustains emotional connections with others, develops and uses the language of the community, cooperates with others, complies with rules, responds to criticism, and respects and takes care of

the possessions of others. 20 C.F.R. § 416.926a(i). The Social Security Regulations outline the sort of interpersonal interactions adolescents within plaintiff's age category of age twelve to eighteen should be able to perform:

> By the time you reach adolescence, you should be able to initiate and develop friendships with children who are your age and to relate appropriately to other children and adults, both individually and in groups. You should begin to be able to solve conflicts between yourself and peers or family members or adults outside your family. You should recognize that there are different social rules for you and your friends and for acquaintances or adults. You should be able to intelligibly express your feelings, ask for assistance in getting your needs met, seek information, describe events, and tell stories, in all kinds of environments (e.g., home, classroom, sports, extra-curricular activities, or part-time job), and with all types of people (e.g., parents, siblings, friends, classmates, teachers, employers, and strangers).

*Id.* The regulations also provide examples of the types of limited functioning in this domain, such as having no close friends; avoiding or withdrawing from people you know or being overly anxious or fearful of meeting new people or experiencing new things; having difficulty playing games or sports with rules; having difficulty communicating; and having difficulty speaking intelligibly or with adequate fluency. *See* 20 C.F.R. § 416.926a(i)(3).

As plaintiff points out and the Commissioner concedes, the ALJ's conclusion that plaintiff had "less than marked" limitations in the domain of interacting and relating to others is inconsistent with the ALJ's conclusion that plaintiff had marked limitations in interacting with others when assessing whether she met the severity of a listed impairment. The Court agrees that the ALJ's finding in this regard is inconsistent; however, the error is harmless and does not warrant remand. Even if the Court were to accept that plaintiff had a marked limitation in this domain of functioning, plaintiff has not shown that the evidence demonstrates an extreme limitation in this domain, which requires that an impairment "interferes very seriously with [a claimant's] ability to independently initiate, sustain, or complete activities." § 416.926a(e)(3).

The record in this case demonstrates that plaintiff's ability to interact and relate to others fluctuated throughout the relevant time period. The ALJ thoroughly discussed the record evidence in this case, including the evidence showing that plaintiff's ability to interact and relate to others often diminished when she became troubled by traumatic events or was not taking her medications as prescribed. The ALJ considered the records cited by plaintiff above, but those records do not support a conclusion that plaintiff was extremely limited in this domain of functioning. Although plaintiff periodically demonstrated a decline in her social functioning, the record also showed significant improvement with medication and treatment. (Tr. 20-21). For example, the ALJ considered that plaintiff had a noticeable decline in social functioning in August 2013, but plaintiff and her mother reported that her condition had improved significantly, she had no recent outbursts or aggression, and she was still able to participate in basketball and track. (Tr. 20). Dr. Barzman's subsequent records showed plaintiff was functioning well both academically and socially throughout 2013 and 2014. (Tr. 21-22). Though plaintiff's social functioning again declined following the death of a cousin in mid-2015, with continued treatment, plaintiff demonstrated an improvement in her ability to interact and relate to others. Despite plaintiff's report that she had "no" friends in mid-2015 (Doc. 23, citing Tr. 1795), subsequent progress notes again reflect improvement in social functioning with treatment, including adjustments of her medication. Plaintiff enjoyed playing basketball on the school team and hanging out with her male friends, whom she referred to as her "brothers," and she denied conflicts with peers or teachers. (Tr. 24, citing Tr. 784, 787; Tr. 26). Other treatment notes indicate that plaintiff was socially outgoing and functioned well in sports and academics. (Tr. 784, 787, 872, 938-39, 1239, 1283, 1516, 1672). *See Williams o/b/o JNN v. Comm'r of Soc. Sec.*, No. CV 16-13608, 2017 WL 8809782, at *6 (E.D. Mich. Oct. 31, 2017) (Report and

Recommendation) (ALJ reasonably concluded that plaintiff's ability to regularly participate in team sports undermined a finding of greater limitations in the domain of interacting and relating to others), *adopted*, 2018 WL 851282 (E.D. Mich. Feb. 14, 2018). Moreover, the reviewing psychologists and pediatricians opined that plaintiff had marked, but not extreme, limitations in interacting and relating to others. (Tr. 106, 118).

The Court acknowledges that certain treatment records cited by plaintiff demonstrate limitations in her ability to interact with and relate to others at various times during the relevant period. Nevertheless, the treatment and school records as a whole do not support a finding that plaintiff was extremely limited in her ability to interact and relate to others. No physician, treatment provider, or school official has opined that plaintiff's ability to function in this domain was extremely limited. Nor has plaintiff demonstrated that she has a marked limitation in a second domain, as explained below. *See* 20 C.F.R. § 416.926a(d) (to functionally equal an impairment in the listings, an impairment must result in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain). The Court finds no reversible error in this case. Plaintiff's first assignment of error should be overruled.

### 2. Whether the ALJ erred in failing to find plaintiff had a marked limitation in her ability to attend and complete tasks.

Plaintiff argues that the ALJ erred in finding that she had less than marked limitations in her ability to attend and complete tasks. (Doc. 8 at 4). Plaintiff argues that the ALJ failed to address her educational records, which outline her difficulties in school and her need for a 504 Plan and IEP/Behavioral Intervention Plan. (Doc. 8 at 4). Plaintiff argues that her educational records show that she does not finish tasks in class, has difficulty staying focused, frequently asks to leave the room, is not motivated to complete tasks, and at times refuses to perform tasks.

21

(*Id.* at 5) (citing Tr. 236-37, 246). Plaintiff also argues that her educational records document that she often put her head down in class, zoned out, did not complete work, decreased communication, became defensive, and showed less participation, which all affected her learning and concentration. (*Id.*) (citing Tr. 802-11). Plaintiff further argues that she was noted to be repeatedly absent or tardy and frequently left the school building without permission. (*Id.*) (citing Tr. 886)

In response, the Commissioner argues that the ALJ reasonably concluded that plaintiff had less than marked limitations in attending and completing tasks. (Doc. 15 at 5). The Commissioner argues that the ALJ's finding is consistent with the opinions of the state agency psychologist and pediatricians, as well as medical evidence that showed that plaintiff's attention and concentration were good, appropriate, and fair for her age. (*Id.* at 5-6). The Commissioner argues that the ALJ explicitly referenced plaintiff's accommodations in school. (*Id.* at 6). The Commissioner further argues that the ALJ reasonably considered that plaintiff's symptoms improved with medication; she received assistance in a general classroom setting; and she played video games and basketball and listened to music. (*Id.*).

The second domain, attending and completing tasks, considers how well a child is able to focus and maintain attention and how well she begins, carries through, and finishes her activities, including the pace at which she performs activities and the ease with which she changes them. 20 C.F.R. § 416.926a(h). The Social Security Regulations outline attention standards that adolescents within plaintiff's age category of age twelve to eighteen should be able to meet:

> In your later years of school, you should be able to pay attention to increasingly longer presentations and discussions, maintain your concentration while reading textbooks, and independently plan and complete long-range academic projects. You should also be able to organize your materials and to plan your time in order to complete school tasks and assignments. In anticipation of entering the

22

workplace, you should be able to maintain your attention on a task for extended periods of time, and not be unduly distracted by your peers or unduly distracting to them in a school or work setting.

20 C.F.R. § 416.926a(h)(2)(v). The regulations also provide examples of types of limited functioning in this domain, including: being easily startled, distracted, or overreactive to sounds, sights, movements, or touch; being slow to focus on, or failing to complete activities of interest, e.g., games or art projects; being repeatedly sidetracked from activities or frequently interrupting others; being easily frustrated and giving up on tasks, including ones in which she is capable of completing; and requiring extra supervision to keep engaged in an activity. 20 C.F.R. § 416.926a(h)(3)(i)-(v).

The ALJ's conclusion that plaintiff had less than marked limitations in the domain of attending and completing tasks is supported by substantial evidence. Specifically, the ALJ explained:

The [plaintiff]'s attention and concentration were noted to be good, appropriate for her age, or fair in August and December 2013, in January 2014, in February 2014, in March 2014, in May 2014, in September 2014, in July 2015 (Exhibit 13F, pages 240-242 and 353-358; Exhibit 14F, pages 2-7, 37-39, 54-59, 85-89, 144-146; Exhibit 16F, pages 60-66). The [plaintiff] was doing better in school in October 2015, which suggests an adequate ability to attend and complete tasks (Exhibit 8F, page 7). There is no evidence supporting limitations greater than "less than marked" in this domain.

(Tr. 31). Contrary to plaintiff's argument, the ALJ thoroughly considered her educational records in assessing whether plaintiff's mental impairments functionally equaled the severity of the listings. The ALJ considered that plaintiff was on a 504 Plan in 2015-2016 and had extra time on tests. (Tr. 23). The ALJ also considered plaintiff's educational records from 2016-2017, which included a 504 Plan, an IEP, and a Behavior Intervention Plan. (Tr. 25) (citing Exh. 11F). In addition, the ALJ considered a variety of opinions from educational sources, including

23

opinions from three of plaintiff's tenth grade teachers. (Tr. 26-27). Specifically, the ALJ considered that plaintiff's gym teacher reported serious problems with plaintiff's ability to attend and complete tasks as she was not prepared for gym class and had difficulty asking for permission, following class rules, and respecting authority. (Tr. 26). Nevertheless, plaintiff's English teacher reported that plaintiff had no or slight problems in attending and completing tasks except an "obvious" problem working without distracting herself or others. (*Id.*) (citing Tr. 250). The ALJ also considered opinions from IEP meetings from plaintiff's interventional specialists and general education teacher. (Tr. 27-28). The ALJ noted that in November 2017, "they reported the [plaintiff]'s behavior over the school year was inconsistent, she was easily distracted from her work, she did not always complete her work, although she was capable of doing so." (Tr. 27). The ALJ also considered opinions contained in the IEP from plaintiff's math and English teachers, who reported that plaintiff performed on par with peers with consistent effort, never distracted others, and had "good and bad days with respect to her effort and focus." (Tr. 28) (citing Tr. 936, 938). Overall, the ALJ afforded the teacher assessments and opinions "some weight" and properly determined that these professionals were not acceptable medical sources under the Regulations and therefore, their opinions were not entitled to any particular deference. (Tr. 27, 28). *See* SSR 06-03p, 2006 WL 2329939 *2. (Only "acceptable medical sources" as defined under 20 C.F.R. § 416.913(a) can provide evidence establishing the existence of a medically determinable impairment and give medical opinions). Even if the educational records that plaintiff cites could support a different conclusion, the ALJ's thorough consideration of the record evidence on plaintiff's ability to attend and complete tasks must be affirmed since it is supported by substantial evidence.

Overall, plaintiff has not demonstrated that she has greater limitations than the ALJ assessed in the domain of attending and completing tasks. Nor has plaintiff cited to an opinion from an acceptable medical source demonstrating that her limitations are greater than those the ALJ assessed. Moreover, the opinions of the state agency consultants, who also determined that plaintiff had "less than marked" limitations in attending and completing tasks, provide further support for the ALJ's determination. *See Lee v. Comm'r of Soc. Sec.*, 529 F. App'x 706, 713 (6th Cir. 2013) (opinions of state agency consultants may be entitled to significant weight when they are supported by substantial evidence) (citing 20 C.F.R. § 404.1527(e)(2)(i)). Accordingly, plaintiff's second assignment of error should be overruled.

**IT IS THEREFORE RECOMMENDED THAT**:

The decision of the Commissioner be **AFFIRMED**, and this matter be closed on the docket of the Court.


Date: 2/21/20

Karen L. Litkovitz
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

DESIREE SPARROW,
Plaintiff,

Case No. 1:18-cv-745
Dlott, J.
Litkovitz, M.J.

vs.

COMMISSIONER OF
SOCIAL SECURITY,
Defendant.

## NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO R&R

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).